**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Elkins**


**GENERAL MOTORS, LLC**,

                Plaintiff,

      v.                                **Civil Action No. 2:12-CV-51**
                                                 Judge Bailey

**BILL KELLEY, INC.**, d/b/a Kelley
Motors, Inc.,

                Defendant.


## <u>MEMORANDUM ORDER</u>

Pending before this Court are Plaintiff General Motors, LLC's Motion for Expedited Consideration (Doc. 4), Defendant Bill Kelley, Inc., d/b/a Kelley Motors, Inc.'s Motion to Dismiss or Alternatively for Summary Judgment (Doc. 19), Defendant Bill Kelley, Inc., d/b/a Kelley Motors, Inc.'s Motion to Disallow Plaintiff's Motion for Preliminary and Permanent Injunction (Doc. 21), and General Motors LLC's Cross Motion for Summary Judgment on All Claims (Doc. 27). All motions have been fully briefed and are ripe for decision.

## BACKGROUND

Prior to the events leading to this litigation, defendant Bill Kelley, Inc. ("defendant" or "Kelley") was an authorized dealer for General Motors Corporation ("GM"), selling Pontiac, Buick and GMC trucks. GM (later known as Motors Liquidation Company, or MLC) encountered financial distress as a result of deterioration in the credit markets and other forces, and on June 1, 2009, filed a voluntary chapter 11 petition for relief in the

United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). To preserve the value of its assets, GM sold the bulk of its assets to a new company with new ownership. The alternative to the Court-approved sale was liquidation, which would have had "appalling consequences for [GM's] creditors, its employees, and our nation." *In re Gen. Motors Corp.*, 2009 WL 2033079, at *1 (S.D. N.Y. July 9, 2009).

After notice and a lengthy evidentiary hearing, on July 5, 2009, the Bankruptcy Court entered an order approving the sale of assets subject to certain terms and conditions (the "363 Sale Order")(Doc. 1-3). The 363 Sale Order, *inter alia,* authorized and approved the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009 (the "MSPA"), for the sale of certain assets. Pursuant to the MSPA and the 363 Sale Order, the designated purchaser, now known as General Motors LLC ("GMLLC") through subsequent transactions, purchased substantially all of the assets of GM free and clear of GM's liabilities, except those expressly assumed under the MSPA.

The Bankruptcy Court found that "[t]he transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances) . . .." (Doc. 1-3, ¶ AA)).

In connection with the bankruptcy proceedings, GM reviewed dealer performance to identify poorly performing dealers and analyzed other factors to select those dealers that would not become part of GM's revamped dealer network. (Doc. 30-1, ¶ 5). These non-retained dealers were offered Wind-Down Agreements, which provided monetary

payments and allowed these dealers to continue selling and servicing GM vehicles under certain conditions until October 31, 2010, when their dealer agreements would expire. (Id.) The Wind-Down Agreements were later assigned to GMLLC pursuant to the terms of the 363 Sale Order and subsequent transactions. (Doc. 30-1, ¶ 6).

The Bankruptcy Court approved the Wind-Down Agreements, or "Deferred Termination Agreements" as the Court described them, and specifically found in paragraph 31 of the 363 Sale Order that these agreements "represent[ed] valid and binding contracts, enforceable in accordance with their terms." (Doc. 1-3, ¶ 31) (*see also In re Gen. Motors Corp.*, 407 B.R. 463, 513-14 (Bankr. S.D. N.Y. 2009). The Bankruptcy Court also expressly retained "exclusive jurisdiction to enforce and implement the terms and provisions of . . . the Deferred Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to . . . (f) resolve any disputes with respect to or concerning the Deferred Termination Agreements." (Doc. 1-3, ¶ 71).

In the bankruptcy proceedings, GM determined not to retain the defendant as an authorized Pontiac, Buick, and GMC Truck dealer. (Doc. 30-1, ¶ 6). GM offered a Wind-Down Agreement to Kelley, which Kelley accepted, executed and returned to GM in June 2009. (Doc. 3-2). As the Bankruptcy Court found, Kelley, like other Wind-Down dealers, could have opted to litigate its rejection rights in lieu of signing the Wind-Down Agreement, but Kelley chose to forego that option and proceed under the terms of the Wind-Down Agreement. *See In re General Motors Corp*, No. 09-50026 (July 6, 2009) (Doc. 28-3, pp. 87-88). Under the Wind-Down Agreement, Kelley agreed to cease its Pontiac, Buick, and GMC Truck dealership operations no later than October 31, 2010.

(Doc. 3-2).

After the 363 Sale, the non-retained dealers sought relief from Congress, which passed legislation that gave "wind-down" dealers the opportunity to seek reinstatement to the GM dealer network through binding arbitration. *See* § 747 of the Consolidated Appropriations Act 2010, Pub. Law 111-117, 123 Stat. 3034 (2009) (the "Dealer Arbitration Act" or "Section 747")[1]. Kelley took advantage of this opportunity and

---

[1] SEC. 747. (a) DEFINITIONS.--For purposes of this section the following definitions apply:

(1) the term "covered manufacturer" means--

(A) an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008; or

(B) an automobile manufacturer which acquired more than half of the assets of an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008.

(2) The term "covered dealership" means an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008, and such agreement was terminated, not assigned in the form existing on October 3, 2008 to another covered manufacturer in connection with an acquisition of assets related to the manufacture of that vehicle brand or brands, not renewed, or not continued during the period beginning on October 3, 2008, and ending on December 31, 2010.

(b) A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Such continuation, reinstatement, or addition shall be limited to each brand owned and manufactured by the covered manufacturer at the time the arbitration commences, to the extent that the covered dealership had been a dealer for such brand at the time such dealer's franchise agreement was terminated, not assigned,

4

not renewed, or not continued.

(c) Before the end of the 30-day period beginning on the date of the enactment of this Act, a covered manufacturer shall provide to each covered dealership related to such covered manufacturer a summary of the terms and the rights accorded under this section to a covered dealership and the specific criteria pursuant to which such dealer was terminated, was not renewed, or was not assumed and assigned to a covered manufacturer.

(d) A covered dealership may elect to pursue the right to binding arbitration with the appropriate covered manufacturer. Such election must occur within 40 days of the date of enactment. The arbitration process must commence as soon as practicable thereafter with the selection of the arbitrator and conclude with the case being submitted to the arbitrator for deliberation within 180 days of the date of enactment of this Act. The arbitrator may extend the time periods in this subsection for up to 30 days for good cause. The covered manufacturer and the covered dealership may present any relevant information during the arbitration. The arbitrator shall balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and shall decide, based on that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer. The factors considered by the arbitrator shall include (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009, (2) the covered manufacturer's overall business plan, (3) the covered dealership's current economic viability, (4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement, (5) the demographic and geographic characteristics of the covered dealership's market territory, (6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and (7) the length of experience of the covered dealership. The arbitrator shall issue a written determination no later than 7 business days after the arbitrator determines that case has been fully submitted. At a minimum, the written determination shall include (1) a description of the covered dealership, (2) a clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer, (3) the key facts relied upon by the arbitrator in making the determination, and (4) an explanation of how the balance of economic interests supports the arbitrator's determination.

(e) The arbitrator shall be selected from the list of qualified arbitrators maintained by the Regional Office of the American Arbitration Association (AAA), in the Region where the dealership is located, by mutual agreement of the covered dealership and covered manufacturer. If agreement cannot be reached on a suitable arbitrator, the parties shall request AAA to select the arbitrator. There will be no depositions in the proceedings, and discovery shall be limited to requests for documents specific to the covered dealership. The parties shall be responsible for their own expenses, fees, and costs, and shall share equally all other costs associated with the arbitration, such as arbitrator fees, meeting room

filed a demand for arbitration pursuant to the Dealer Arbitration Act. Thereafter, the defendant and GMLLC agreed to settle Kelley's arbitration claim and entered into the Option Agreement to Resolve Pending Arbitration ("Settlement Agreement"), which allowed Kelley to continue as a Buick and GMC dealer for a designated period of time, subject to the terms and conditions of the Agreement. (Doc. 3-3).

The Settlement Agreement specifically acknowledges that, as a result of the settlement, Kelley "dismisses with prejudice and forever waives all of its rights in connection with the Arbitration Claim." (Doc. 3-3, ¶ 5). Kelley expressly agreed in the Settlement Agreement that the Settlement Agreement "constitutes a final, enforceable and binding settlement setting forth [the parties'] respective rights and obligations and resolving all

---

charges, and administrative costs. The arbitration shall be conducted in the State where the covered dealership is located. Parties will have the option of conducting arbitration electronically and telephonically, by mutual agreement of both parties. The arbitrator shall not award compensatory, punitive, or exemplary damages to any party. If the arbitrator finds in favor of a covered dealership, the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement.

(f) Any legally binding agreement resulting from a voluntary negotiation between a covered manufacturer and covered dealership(s) shall not be considered inconsistent with this provision and any covered dealership that is a party to such agreement shall forfeit the right to arbitration established by this provision.

(g) Notwithstanding the requirements of this provision, nothing herein shall prevent a covered manufacturer from lawfully terminating a covered dealership in accordance with applicable State law.

pending claims and assertions between Dealer and GM, including those which have been made or could ever be made as a result of any and all matters relating to the Arbitration Claim, the Legislation, the Dealer Agreements, the Wind-Down Agreement, or any Supplemental Agreement." *Id.* Kelley also acknowledged that its decision to enter into the Settlement Agreement was "entirely voluntary and free from any mental, physical, or economic duress." *Id.* at ¶ 22.

Pursuant to ¶ 11 of the Settlement Agreement, the parties executed a 2010 GMLLC Dealer Sales and Service Agreement (Doc. 28-4). The Sales and Service Agreement specifically incorporates by reference the Settlement Agreement.

In the Settlement Agreement, Kelley agreed to achieve an aggregate Retail Sales Index ("RSI") of at least 85 for 2011. (*Id.* at ¶¶ 1(g) and 12). This RSI requirement of 85 is below average – an RSI score of 100 would simply be average performance. (Doc. 30-1, ¶ 4). The Settlement Agreement also provides specific remedies if Kelley fails to meet the requirements of the Agreement. (Doc. 3-3, ¶ 14). Specifically, Kelley agreed that the "Dealer shall, upon written demand by GM, sell all of the assets" identified in the exhibits to the Settlement Agreement. *Id.* The Settlement Agreement also specifies the purchase price and other details related to GM's exercise of the option. *Id.* at ¶ 15. The Settlement Agreement further provides if Kelley institutes any proceeding "or otherwise asserts any Claim that is covered by the release" provision, such a breach "shall absolutely entitle GM to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's application for injunctive relief and prohibiting any further act by Dealer in violation of Section 18" of the Settlement Agreement. *Id.* at ¶ 18(b).

Kelley failed to achieve an aggregate Retail Sales Index ("RSI") of at least 85 for 2011, and by letter dated June 8, 2012, GMLLC gave notice to Kelley that "[p]ursuant to the Option Agreement, including Section 14(a)(ii), GM is exercising its option to purchase the Assets of Dealer for the Reinstated Brands." (Doc. 3-5). Kelley has refused to comply with the terms of the Settlement Agreement, leading to this litigation.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see **Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." ***Anderson***, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a

8

genuine issue for trial.   Fed. R. Civ. P. 56(c);  **Celotex Corp**., 477 U.S. at 323-25;  **Anderson**, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  **Anderson**, 477 U.S. at 249 (citations omitted).

## DISCUSSION

In seeking to avoid any obligations under the Settlement Agreement, Kelley essentially raises two arguments.  First, Kelley argues that the actions of GMLLC violate the provisions of West Virginia Code §§ 17A-6A-4 and 7.  Second, the defendant argues that the Settlement Agreement is null and void by virtue of West Virginia Code § 17A-6A-18.

As noted by Judge Broadwater in **United States ex rel. McDermitt, Inc. v. Centex Simpson Const. Co.**, 34 F.Supp.2d 397 (N.D. W.Va. 1999):

> A strong policy of the Fourth Circuit is to foster settlement in order to advantage the parties and to conserve scarce judicial resources.  **Central Wesleyan College v. W.R. Grace & Co.**, 6 F.3d 177 (4th Cir. 1993).  Once a settlement agreement is reached, a district court judge possesses "the inherent authority to enforce a settlement agreement and to enter judgment based on an agreement without a plenary hearing."  **Petty v. The Timken Corp.**, 849 F.2d 130, 132 (4th Cir. 1988);  **Young v. F.D.I.C.**, 103 F.3d 1180, 1194 (4th Cir. 1997);  **Millner v. Norfolk & W.R. Co.**, 643 F.2d 1005, 1009

(4th Cir. 1981).[2]

For example, when parties have agreed to a settlement that was reduced to terms of dollars and cents, the district court has the power and authority to enforce payment of that amount and should not set aside the agreement absent substantial unfairness. "Trial courts possess the inherent authority to enforce a settlement agreement and enter judgment without a plenary hearing. . .. Unless the resulting settlement is substantially unfair, judicial economy commands that a party be held to the terms of a voluntary agreement." *Petty*, 849 F.2d at 132–33 (internal citations omitted).

A motion to enforce a settlement agreement is an action for specific enforcement of a contract. ***Adams v. Johns–Manville Corp.***, 876 F.2d 702 (9th Cir. 1989). The general principle is that a settlement agreement, voluntarily entered into, cannot be repudiated by either party and will be summarily enforced by the court. ***Petty***, 849 F.2d at 133 (defeated expectations do not entitle the litigant to repudiate commitments made to opposing parties or to the court); ***Mungin v. Calmar Steamship Corp.***, 342 F.Supp. 484, 485 (D. Md. 1972); ***Autera v. Robinson***, 419 F.2d 1197, 1201 n. 17 (D.C. Cir. 1969). *See also* ***Worthy v. McKesson Corp.***, 756 F.2d 1370

---

[2] The Fourth Circuit stands in line with the majority of the other circuits. *See, e.g.,* ***Wilson v. Wilson***, 46 F.3d 660, 664 (7th Cir. 1995) (stating that circuits have uniformly stated that a district court possesses the inherent or equitable power summarily to enforce an agreement to settle a case pending before it) (citations omitted); ***Vari–O–Matic Mach. Corp. v. New York Sewing Mach. Attachment Corp.***, 629 F.Supp. 257, 258 (S.D. N.Y. 1986) (stating that a court has the inherent power, and *indeed the duty,* to enforce a settlement in a case pending before it) (emphasis added).

(8th Cir. 1985) (parties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement later proves to be disadvantageous).  Because "a settlement agreement enjoys great favor with the courts, consequently, it is only in the most *extraordinary circumstances* that such a pact will be vacated. . .." ***Mungin***, 342 F.Supp. at 485 (emphasis added).

34 F.Supp.2d at 399.

With respect to the first argument, West Virginia Code § 17A-6A-4 provides that "[n]otwithstanding any agreement, a manufacturer shall not cancel, terminate, fail to renew or refuse to continue any dealer agreement" unless the manufacturer complies with certain conditions.[3]  One of those conditions is compliance with the notice provisions of § 17A-6A-

_____

[3] West Virginia Code § 17A-6A-4 provides in full:

§ 17A-6A-4.  Cancellation of dealer contract; notification

(1) Notwithstanding any agreement, a manufacturer or distributor shall not cancel, terminate, fail to renew or refuse to continue any dealer agreement with a new motor vehicle dealer unless the manufacturer or distributor has complied with all of the following:

(a)  Satisfied the notice requirement of section seven of this article;

(b)  Acted in good faith;

(c)  Engaged in full and open communication with franchised dealer; and

(d)  Has good cause for the cancellation, termination, nonrenewal or discontinuance.

(2)  Notwithstanding any agreement, good cause exists when a manufacturer or distributor can demonstrate termination is necessary due to a material breach of a reasonable term or terms of the agreement by a dealer when weighed against the interests of the dealer and the public.  The interests of the dealer and the public shall include consideration of:
(a)  The relationship of the dealer's sales to the sales in the relevant market;

7.

West Virginia Code § 17A-6A-7 provides for 120 days notice (30 days under certain circumstances - not relevant here) of the effective date of the intended termination, cancellation, nonrenewal or discontinuance by certified mail and provides for certain

———————————————

(b)  The investment and financial obligations of the dealer under the terms of the franchise agreement;

(c)  The effect on the public cancellation of the franchise agreement would cause;

(d)  The adequacy of the dealer's sales and service facilities, equipment, parts and personnel in relation to other dealers in the relevant market;

(e)  Whether the dealer is honoring existing warranties;

(f)  Whether the dealer is complying, or can comply within a reasonable time, with reasonable capitalization requirements; and

(g)  The dealer's overall performance under the reasonable terms of the franchise agreement.  This shall include the overall fairness of the agreement terms, the enforceability of the agreement and the relative bargaining power of the parties.

(3)  If the failure by the new motor vehicle dealer to comply with a provision of the dealer agreement relates to the performance of the new motor vehicle dealer in sales or service, good cause exists for the purposes of a termination, cancellation, nonrenewal or discontinuance under subsection (1) of this section when the new motor vehicle dealer failed to effectively carry out the performance provisions of the dealer agreement if all of the following have occurred:

(a)  The new motor vehicle dealer was given written notice by the manufacturer or distributor of the failure;

(b)  The notification stated that the notice of failure of performance was provided pursuant to this article;

(c)  The new motor vehicle dealer was afforded a reasonable opportunity to exert good faith efforts to carry out the dealer agreement; and

(d)  The failure continued for more than three hundred sixty days after the date notification was given pursuant to subdivision (a) of this subsection.

information to be contained in the notice.[4]

---

[4] West Virginia Code § 17A-6A-7 provides as follows:

## § 17A-6A-7. Notice provisions

Notwithstanding any agreement, prior to the termination, cancellation, nonrenewal or discontinuance of any dealer agreement, the manufacturer or distributor shall furnish notice of the termination, cancellation, nonrenewal or discontinuance to the new motor vehicle dealer as follows:

(a) Except as otherwise provided in this section, notice shall be made not less than one hundred twenty days prior to the effective date of the termination, cancellation, nonrenewal or discontinuance.

(b) Notice shall be by certified mail with restrictive delivery to the new motor vehicle dealer principal and shall contain the following:

(1) A statement of intention to terminate, cancel, not renew or discontinue the dealer agreement;

(2) A detailed written statement of all reasons for the termination, cancellation, nonrenewal or discontinuance.  The statement shall include, at a minimum, a complete explanation of each reason upon which the manufacturer or distributor relies to support its proposed action, along with all supporting documentation which is material to the proposed action and available to the manufacturer or distributor at the time of termination, cancellation, nonrenewal or discontinuance; and

(3) The date on which the termination, cancellation, nonrenewal or discontinuance takes effect.

(c) Notwithstanding subdivision (a) of this subsection, notice shall be made not less than thirty days prior to the effective date of the termination, cancellation, nonrenewal or discontinuance for any of the following reasons:

(1) Insolvency of the new motor vehicle dealer or the filing of any petition by or against the new motor vehicle dealer under any bankruptcy or receivership law;

(2) Failure of the new motor vehicle dealer to conduct his or her customary sales and service operations during his or her customary business hours for seven consecutive business days;

(3) Conviction of the new motor vehicle dealer or its principal owners of a crime, but only if the crime is punishable by imprisonment in excess of one year under the law under which

the dealer was convicted or the crime involved theft, dishonesty or false statement regardless of the punishment;

(4) Revocation of a motor vehicle dealership license in accordance with section eighteen, article six of this chapter; or

(5) A fraudulent misrepresentation by the new motor vehicle dealer to the manufacturer or distributor, which is material to the dealer agreement.

(d) Notwithstanding subdivision (a) of this subsection, notice shall be made not less than twelve months prior to the effective date of a termination, cancellation, nonrenewal or discontinuance if a manufacturer or distributor discontinues production of the new motor vehicle dealer's product line or discontinues distribution of the product line in this state.

(e) Except as provided in subdivision (c) of this subsection, any motor vehicle dealer who receives a notice of intent to discontinue, cancel or not renew a dealer agreement may, within a one hundred twenty-day notice period, file a petition or complaint for a determination of whether such action is an unfair or prohibited discontinuation, cancellation or nonrenewal. Dealer agreements and certificates of appointment shall continue in effect until a final determination of the issues raised in such petition or complaint by the motor vehicle dealer. A discontinuance, cancellation or nonrenewal is unfair if it is:

(1) Not clearly permitted by the dealer agreement;

(2) Not undertaken for good cause; or

(3) Is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach.

(f) No replacement dealer shall be named for this point or location to engage in business and the dealer's agreement shall remain in effect until a final judgement is entered after all appeals are exhausted: *Provided*, That when a motor vehicle dealer appeals a decision upholding a discontinuation, cancellation or nonrenewal under subdivisions (f) and (g) of this section, the dealer agreement shall remain in effect pending exhaustion of all appeals only if the motor vehicle dealer establishes a likelihood of success on appeal and that the public interest will not be harmed by keeping the dealer agreement in effect pending entry of final judgement after such appeal.

(g) If a transfer of ownership is proposed after a notice to discontinue, cancel or not renew a dealer agreement is received but, prior to the final determination, including exhaustion of all appellate remedies of a motor vehicle dealer's complaint or petition contesting such action, the termination proceedings shall be stayed, without bond, during the period the transfer is being reviewed by the manufacturer or distributor. During the period that the

This argument fails to recognize that Kelley entered into the Settlement Agreement which specifically provided for the exercise of the option to purchase Kelley's assets in the event that it failed to reach the performance standards set forth in the agreement. The West Virginia statutes upon which Kelley relies proscribe unilateral or coercive actions on the part of the manufacturer. In *C & O Motors, Inc. v. General Motors Corp.*, 323 Fed.Appx. 193 (4th Cir. 2009) (unpublished), the United States Court of Appeals for the Fourth Circuit evaluated a letter agreement that a West Virginia dealer claimed constituted a "termination" by a manufacturer when enforced. The Fourth Circuit rejected the dealer's argument and held that the agreement was enforceable under the West Virginia Code because it was a valid contract that the parties freely executed, finding that C & O breached a provision of its dealer agreement, that GM offered to discharge this contractual breach on condition that C & O release any claim for compensation, and that "C & O was therefore

_____

transfer is being reviewed by the manufacturer or distributor, the dealer agreement shall remain in full force and effect, and the motor vehicle dealer shall retain all rights and remedies pursuant to the terms and conditions of the dealer agreement and applicable law. This shall include, but is not limited to, all rights of transfer under subdivision (2), section ten, article six-a, chapter seventeen of this code until such time as the manufacturer or distributor has accepted or rejected the proposed transfer. If the proposed transfer is rejected, the motor vehicle dealer shall retain all of its rights pursuant to section sixteen of said article to a judicial determination as to whether the manufacturer or distributor's rejection is in compliance with the provisions of subdivision (2), section ten of said article and during the pendency of such judicial proceeding, and any related appellate proceedings, the termination proceedings shall remain stayed without bond, the dealer agreement shall remain in full force and effect and the motor vehicle dealer shall retain all rrghts and remedies pursuant to the terms and conditions of the dealer agreement and applicable law including all rights of transfer. If a transfer is approved by the manufacturer or distributor or mandated by law, the termination proceedings shall be dismissed with prejudice as moot.

**not required** to release its claims relating to separation costs as proscribed by § 17A-6A-10(1)(h)." *Id*. at 200 (emphasis added).

Kelley asserts that the exercise of the option in the Settlement Agreement is tantamount to a termination, while GMLLC contends that it is not terminating the Dealer Agreement. The resolution of this dispute is not required in this case, because Kelley **agreed** that the option could be exercised if it failed to meet the performance standards.

In *Mazda Motors of Amer., Inc. v. Southwestern Motors, Inc.*, 296 N.C. 357, 250 S.E.2d 250 (1979), the Supreme Court of North Carolina found that the North Carolina dealer protection statute did not extend to mutual agreements between the manufacturer and dealer to terminate a franchise. The Court noted that the North Carolina statute, like the West Virginia statute, "is expressly couched in terms of the unilateral conduct of the franchisor." 296 N.C. at 362, 250 S.E.2d at 253. *See also, Minson Plymouth, Inc. v. Chrysler Motors Corp.*, 554 F.2d 1266 (4th Cir. 1977) and *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir. 1976).

Kelley's assertion that the 2010 GMLLC Dealer Sales and Service Agreement (Doc. 28-4) subjects the Settlement Agreement to the terms and conditions of the West Virginia statutes is unavailing. The 2010 GMLLC Dealer Sales and Service Agreement was executed pursuant to the Settlement Agreement. It was clear to Kelley that if it failed to meet the performance standards, the option in the Settlement Agreement would be exercised, and Kelley specifically agreed to such a result.

In addition, Kelley is estopped from arguing the invalidity of the Settlement Agreement. In the Settlement Agreement, Kelley agreed that:

Dealer acknowledges and agrees that **this Agreement constitutes a final, enforceable and binding settlement** setting forth their respective rights and obligations and resolving all pending claims and assertions between Dealer and GM, including those which have been made or could ever be made as a result of any and all matters relating to the Arbitration Claim, the Legislation, the Dealer Agreements, the Wind-Down Agreement, or any Supplemental Agreement.

(Doc. 3-3, ¶ 5).

In ***Wachovia Bank, N.A. v. Schmidt***, 445 F.3d 762 (4th Cir. 2006), the Fourth Circuit explained that "[e]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." ***Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,*** 206 F.3d 411, 417-18 (4th Cir. 2000) (internal quotation marks omitted). This legal principle rests on a simple proposition: it is unfair for a party to "rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage." ***Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.,*** 659 F.2d 836, 839 (7th Cir. 1981) (internal quotation marks and alteration omitted). *See also* ***Long v. Silver***, 248 F.3d 309, 320-21 (4th Cir. 2001) (observing that "[a]llowing Plaintiff to avoid the consequences of a [shareholder agreement] while invoking its benefits . . . would both disregard equity and contravene the [Federal Arbitration Act].") (internal citations omitted).

In this case, the Settlement Agreement was executed to resolve pending litigation. Had Kelley lost the litigation, Kelley would have been required to wind down its operations

in accordance with the Wind-Down Agreement approved by the United States Bankruptcy Court for the Southern District of New York. Instead, Kelley chose to settle the litigation and operate as a GM dealer under the Settlement Agreement's terms. Kelley received financial consideration in connection with the Settlement Agreement and another wind down agreement executed for another affiliated dealership. GMLLC relied on Kelley's promises and commitments in the Settlement Agreement in agreeing not to proceed with its arbitration rights under federal law.

Having induced GM to enter into the Settlement Agreement to remain in the dealer network rather than risk losing the arbitration, and having then enjoyed the benefits of remaining in GM's dealer network for two years without completing the arbitration, Kelley is now estopped from challenging the Settlement Agreement's application or validity.

Accordingly, this Court finds that the plaintiff is entitled to the relief requested. With regard to the prayer for injunctive relief, this Court finds that the plaintiff has satisfied the requirements therefor, as discussed below.

The Settlement Agreement specifically allows GMLLC to obtain specific performance and an uncontested injunction in the event of any failure to perform under the terms of the Settlement Agreement:

13. <u>Failure to Perform</u>. Dealer's failure at any time during the term of the Dealer Agreements to timely perform any of its obligations as set forth herein shall constitute a breach of this Agreement.

14. <u>Remedies</u>.

(a) In the event of a breach of this Agreement by Dealer, GM shall have any or all of the following rights and remedies, at GM's sole election: (i) GM shall

be entitled to all of its rights and remedies at law or in equity, including the
right to specifically enforce this Agreement.

(Doc. 3-3, ¶¶ 13 & 14).

Section 18(b) of the Settlement Agreement likewise contains a broad covenant not
to sue and provides for an automatic injunction if Kelley breaches the release provisions
in the Settlement Agreement:

[Kelley], for itself, and the other Dealer Parties, hereby agrees not to, at any
time, sue, protest, institute or assist in instituting any proceeding in any court
or administrative proceeding, or otherwise assert any Claim that is covered
by the release provision in subparagraph (a) above.  As a result of the
foregoing, any such breach shall absolutely entitle GM to an immediate and
permanent injunction to be issued by any court of competent jurisdiction,
precluding [Kelley] from contesting GM's application for injunctive relief and
prohibiting any further act by [Kelley] in violation of this Section 18.   In
addition, GM shall have all other equitable rights in connection with a breach
of this Section 18 by [Kelley], including, without limitation, the right to specific
performance.

(Doc. 3-3, ¶ 18).

Accordingly, Kelley has already acknowledged and agreed to the need for injunctive
relief where Kelley acts inconsistent with the terms of the Settlement Agreement.  It would
make no sense to "disallow" GMLLC's request for injunctive relief when such relief is
expressly called for by the parties' own Agreement.

GMLLC has demonstrated that it will suffer irreparable harm in the absence of

injunctive relief. The 60-day period specified for the closing under the option has expired, and Kelley remains in default of its obligations under the Settlement Agreement. Accordingly, Kelley's lack of compliance with the Settlement Agreement is good cause for issuance of an injunction. The Fourth Circuit has upheld injunctions where the harm alleged is similarly concrete. *See, e.g., **Candle Factory, Inc. v. Trade Assoc. Group***, 23 Fed.Appx. 134 at 138-139 (4th Cir. 2001) (unpublished) (upholding injunction because evidence in record showed movant had a valid copyright on items which non-movant was infringing upon and movant's business was derived from infringed items); ***O'Brien v. Appomattox Co., Virginia***, 71 Fed.Appx. 176 (4th Cir. 2003) (unpublished) (granting preliminary injunction in an environmental case, in part, because the plaintiffs would suffer economic losses that they may or may not have been able to recover through pending litigation if the injunction was not granted); ***Rum Creek Coal Sales, Inc. v. Caperton***, 926 F.2d 353 (4th Cir. 1991) (reversing a finding that no injunctive relief was necessary in part because the movant faced severe monetary damage to its business, physical harm to employees, and substantial litigation in alternative forums to attempt to minimize severe damage caused by non-movant).

Similarly, GMLLC's harm is real and immediate, as evidenced by the clear terms of the Settlement Agreement. Kelley's actions in direct contravention of the Agreement have already occurred. Moreover, as in ***Rum Creek***, Kelley's actions in blocking GMLLC's purchase of its assets have caused GMLLC immediate damage by depriving it of the very advantages set forth in the Agreement. Contrary to Kelley's assertions, these harms are not "highly speculative"; they are outlined in the Settlement Agreement itself.

Finally, Kelley's breaches threaten GMLLC with irreparable harm by forcing GMLLC to retain a dealer that has failed to meet the minimal performance requirements of its Settlement Agreement. GMLLC's association with a brand that has significantly underperformed has harmed GMLLC's brand and image. Thus, Kelley continues to impose harm on GMLLC through its failure to abide by the terms of its contractual agreement and failure to allow GMLLC to purchase its assets.

The defendant will not be irreparably harmed. GMLLC is merely exercising its option to purchase certain specified assets under the Settlement Agreement. Kelley waited more than two years after Kelley signed the Settlement Agreement to challenge it. For over two years, Kelley enjoyed the benefits of operating under the Settlement Agreement (unlike other dealers who lost their arbitrations).

In its Motion, Kelley states that it would face harm if an injunction is issued because it would lose its dealership assets. Such harm cannot be used as a basis for rejecting injunctive relief, because the alleged "loss" was contemplated by the parties' Settlement Agreement. Kelley knew the possibility of this "harm" when it entered into the Agreement and accepted that result. Kelley cannot change course now that it has failed to meet its obligations under the Agreement's terms and provisions.

Kelley further contends that it will be harmed if an injunction is issued because it will be "deprived of its contractual rights" under the Dealer Sales and Service Agreement and of its claimed "statutory rights to notification" under the West Virginia Code. Those arguments are not well taken for multiple reasons, including: (1) the Settlement Agreement is valid under West Virginia law; (2) Kelley long ago waived its claimed attacks on the Settlement Agreement; and (3) the "termination" provisions of the state statute do not apply

21

in any event because GM is not unilaterally "terminating" any "franchise" agreement as contemplated by the statute.

Finally, an injunction serves the public interest.  The enforceability of agreements, such as the Settlement Agreement at issue in this case, is important to the judicial system because such settlement agreements are strongly favored as a matter of public policy.  *See U.S. ex rel. McDermitt, Inc. v. Centex-Simpson Const. Co., Inc.*, 34 F.Supp.2d 397 (N.D. W.Va. 1999).  The Settlement Agreement that the parties executed is a valid and enforceable contract that resolved a federal arbitration filed under federal legislation.

Furthermore, issuing an injunction that upholds the validity of the Settlement Agreement will support settled principles of equity.  It would be unjust to allow Kelley to essentially void or rescind the Agreement after enjoying the benefits of operating under it for more than two years.  In its Motion, Kelley asserts that the issuance of an injunction will not be in the public interest because GM's exercise of its option would "unjustly" eliminate local jobs and commerce from the Kelley dealership.  Those arguments fail because they are the very results that the parties expressly bargained for under the terms of the Settlement Agreement itself.  It is too late for Kelley to change its mind on provisions that it voluntarily and willingly accepted.

## CONCLUSION

For the reasons stated above:

A.      Plaintiff General Motors, LLC's Motion for Expedited Consideration (Doc. 4) is **DENIED AS MOOT**;

B.      Defendant Bill Kelley, Inc., d/b/a Kelley Motors, Inc.'s Motion to Dismiss or

Alternatively for Summary Judgment (Doc. 19) is **DENIED**;

      C.      Defendant Bill Kelley, Inc., d/b/a Kelley Motors, Inc.'s Motion to Disallow Plaintiff's Motion for Preliminary and Permanent Injunction (Doc. 21) is **DENIED**;

      D.      General Motors, LLC's Cross Motion for Summary Judgment on All Claims (Doc. 27) is **GRANTED**;

      E.      This Court hereby **DECLARES** that the Settlement Agreement is valid and binding, that GM has the right to purchase the designated assets pursuant to the terms of the Settlement Agreement, that defendant's actions are contrary to the Settlement Agreement and are barred as a matter of law, and that no other statutes apply to, limit or restrict the enforceability of the Settlement Agreement;

      F.      The defendant is hereby **ORDERED** to specifically perform its obligations under the Settlement Agreement;

      G.      The defendant is hereby **ENJOINED**  from any further interference with GMLLC's exercise of its option to purchase and/or other rights under the Settlement Agreement; and

      H.      The plaintiff is hereby **ORDERED** to submit to this Court an affidavit setting forth in detail its claim for its recoverable damages, including attorney's fees and costs, to the extent permitted by applicable law, and other damages incurred in this litigation or otherwise to the extent permitted by applicable law on or before **November 30, 2012**.  The defendant shall submit any opposition to the statement of recoverable damages on or before **December 31, 2012**.

      It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record herein.

**DATED:** October 31, 2012.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE